Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
April 20, 2020

**2020 CO 27**

**No. 18SA244, *Santa Maria Reservoir Co. v. Warner*—Application for Change of Use of Water—Native Water—Imported Water—Hydraulic Divide.**

The supreme court affirms the water court's approval of the change-of-use application submitted by the Santa Maria Reservoir Company ("SMRC") with respect to the water it diverts from the Rio Grande into the Closed Basin. Like the water court, the supreme court concludes that the water SMRC diverts into the Closed Basin is imported water because it does not naturally flow into the Closed Basin and, once there, does not naturally return to the Rio Grande. In so doing, the supreme court rejects the appellant's contention that the water in question cannot be imported water because the Rio Grande and the Closed Basin are hydraulically connected. Instead, since the record establishes that a hydraulic divide currently exists between the two stream systems, the supreme court finds them to be unconnected.

Relying on longstanding precedent establishing that downstream users of return flows from imported water do not have a vested right in the future importation of such water, the supreme court rules that the appellant was not injured by the water court's approval of SMRC's change-of-use application. Contrary to the appellant's contention, the court holds that SMRC is entitled to fully consume all of the water it imports into the Closed Basin.

Further, the supreme court upholds the water court's rulings recognizing the historical irrigation use of SMRC's water rights on lands served by the Monte Vista and Rio Grande Canals and the historical irrigation practice of recharging the unconfined aquifer of the Closed Basin with SMRC's water rights.

**The Supreme Court of the State of Colorado**
2 East 14th Avenue • Denver, Colorado 80203

**2020 CO 27**

**Supreme Court Case No. 18SA244**
*Appeal from District Court*
Alamosa County District Court, Water Division 3, Case No. 13CW3002
Honorable Pattie P. Swift, Water Judge

Concerning the Application for Water Rights of the Santa Maria Reservoir
Company in the Rio Grande or its Tributaries.

**Applicant-Appellee:**

Santa Maria Reservoir Company,

v.

**Opposer-Appellant:**

Jim Warner,

**and**

**Opposers-Appellees:**

Colorado Division of Parks and Wildlife, Colorado Water Conservation Board,
Conejos Water Conservancy District, Costilla Ditch Company, Rio Grande Water
Conservation District, and Richard H. Ramstetter,

**and Concerning**

**Appellees:**

Kevin Rein, State Engineer; and Craig W. Cotten, Division Engineer, Water
Division 3.

**Judgment Affirmed**
*en banc*
April 20, 2020

**Attorneys for Applicant-Appellee:**
Carlson, Hammond & Paddock, LLC
William A. Paddock
Mason H. Brown
Katrina B. Fiscella
 *Denver, Colorado*

**Attorneys for Opposer-Appellant:**
Confluence Water Law LLC
John J. Cyran
 *Denver, Colorado*

Richard L. Arnett
 *Alamosa, Colorado*

**Attorneys for Opposer-Appellee Rio Grande Water Conservation District:**
Hill & Robbins, P.C.
David W. Robbins
Peter J. Ampe
Matthew A. Montgomery
 *Denver, Colorado*

**Attorneys for Appellee Craig W. Cotten:**
Philip J. Weiser, Attorney General
Paul L. Benington, First Assistant Attorney General
 *Denver, Colorado*

No appearance on behalf of Colorado Division of Parks and Wildlife, Colorado Water Conservation Board, Conejos Water Conservancy District, Costilla Ditch Company, Richard H. Ramstetter, or Kevin Rein.

**JUSTICE SAMOUR** delivered the Opinion of the Court.

¶1 Singer-songwriter Joni Mitchell wrote in one of her hit songs that "you don't know what you've got 'til it's gone." Joni Mitchell, *Big Yellow Taxi* (Siquomb Publ'g Corp. 1970). The sentiment is helpful in articulating our resolution of this appeal from the District Court of Water Division No. 3 (the "water court"). We conclude that Jim Warner was not injured by the water court's approval of the change-of-use application submitted by the Santa Maria Reservoir Company ("SMRC" or the "Company") with respect to the water it diverts from the Rio Grande into the Closed Basin. Because that water is imported water, SMRC is entitled to fully consume all of it. The water would not be in the Closed Basin, much less available for use by Warner and other water users in the Closed Basin, without its importation by SMRC. Thus, rather than cause an injury to Warner, the approval of SMRC's application simply revealed to him that his past use of return flows from SMRC's imported water in the Closed Basin was a benefit to which he had no enforceable right; Warner just didn't know what he had 'til it was gone.

¶2 Warner presents a gumbo of claims in urging us to overturn the water court's approval of SMRC's application. First, he argues that the water court applied the wrong legal standard in determining that the water SMRC diverts from the Rio Grande into the Closed Basin is imported. Second, Warner contends that the water court's imported-water determination was based on its mistaken

3

conclusion that the Rio Grande and the Closed Basin are "unconnected" stream systems. According to Warner, the two stream systems are hydraulically connected, and the water court's contrary finding ignores its own legal precedent and this court's caselaw. Finally, Warner posits that the water court's decree is inconsistent with the General Assembly's efforts to manage the surface and groundwater systems in the San Luis Valley (the "Valley"). More specifically, Warner challenges the water court's definition of imported water as overly broad and asserts that the decree issued effectively permits the removal of "thousands of acre-feet" of water from the Valley without regard for the impact of that removal upon individual water users and the long-term sustainability of water systems in the Valley.[1]

¶3     In order to place this appeal in context, we begin by visiting the central tenets of the prior appropriation doctrine and the principles governing water users' rights in imported water. We then transition to an overview of the history of the administration of water rights in the particular area at issue, Subdistrict No. 1 of Water Division No. 3 (the "Subdistrict"). An understanding of this

---

[1] Warner also requests that we review the water court's alternative ruling that even if the water in dispute is not imported into the Closed Basin, SMRC's change of use would not cause a legally cognizable injury to Warner's water rights. Because we conclude that the water under scrutiny is imported by SMRC into the Closed Basin, we need not address this issue.

background is important because it simultaneously sheds light on SMRC's motivation for seeking the contested change of use and informs our analysis of Warner's arguments. We next set forth this case's factual and procedural history, followed by the governing standard of review. We end by analyzing the merits of the claims raised by Warner. Because we conclude that the water court's factual findings have record support and that the water court correctly interpreted and applied Colorado law, we affirm its judgment.

## I. Relevant Legal Principles

¶4 Under Colorado law, use rights pertaining to water that's "native"[2] to a public stream are governed by the doctrine of prior appropriation. *City of Thornton v. Bijou Irrigation Co.*, 926 P.2d 1, 65 (Colo. 1996). Pursuant to this doctrine, "[t]he first person to divert unappropriated water and to apply it to a beneficial use has a water right superior to subsequent appropriators from the same water resource." *Navajo Dev. Co. v. Sanderson*, 655 P.2d 1374, 1377 (Colo. 1982). Though subsequent users may appropriate water from the same source, those subsequent users (whose rights are "junior" to the prior appropriator's) may

---

[2] "Native" water refers to surface and underground water naturally occurring in a watershed. *See Native Waters*, R. Waskom & M. Neibauer, *Glossary of Water Terminology*, Colo. St. U. Extension (May 2012), https://extension.colostate.edu/topic-areas/agriculture/glossary-of-water-terminology-4-717/ [https://perma.cc/DP3A-RDTY].

not appropriate water to the extent that it diminishes the amount needed by the previous water users ("senior" rights holders). *See* Colo. Const. art. 16, § 6; § 37-92-103(10) C.R.S. (2019); *Burlington Ditch Reservoir & Land Co. v. Metro Wastewater Reclamation Dist.*, 256 P.3d 645, 661 (Colo. 2011). Regardless of how senior one's water right may be, however, the prior appropriation doctrine only entitles water users to use as much water as they actually need — any surplus water remaining after an appropriator's initial use, e.g., return flows, must be allowed to return to the stream from which it came so that it is available for use by downstream water users. *Pulaski Irrigating Ditch Co. v. City of Trinidad*, 203 P. 681, 682 (Colo. 1922). This requirement speaks to the concept, central to Colorado's prior appropriation doctrine, that water users must avoid causing injury to the rights of other users.[3] *See, e.g.*, § 37-92-302(2)(a), C.R.S. (2019).

¶5     Notably, though, the concern about injury to downstream water users isn't present in the context of water that has been "imported" to a stream system or watershed.[4] This is so because "the ability of downstream users to divert imported

---

[3] We defined "injury" to a water right in *Burlington Ditch*, 256 P.3d at 661, as a "diminution of the available water supply that a water right holder would otherwise enjoy at the time and place and in the amount of demand for beneficial use under the holder's decreed water right operating in priority."

[4] Over time, this court has come to treat "imported," "foreign," and "developed" water similarly. *See, e.g.*, *Bijou*, 926 P.2d at 66 ("'[F]oreign water' includes nontributary groundwater introduced into a stream as well as water imported

water exists entirely at the sufferance of the importer." *Bijou*, 926 P.2d at 72; *see also id.* at 71 ("[D]ownstream users of return flows from foreign waters gain only a right in the water that they actually divert and do not have a vested right in future importation."). Accordingly, "a different standard has evolved for water that is brought into a watershed or stream system from a source unconnected with the receiving system." *Id.* at 66.

¶6 This different standard traces back to a case from the early twentieth century, *Ripley v. Park Center Land & Water Co.*, 90 P. 75 (Colo. 1907), which dealt with developed water added to a stream by the petitioner's own efforts. *Id.* at 76–77. In *Ripley*, the dispute centered on underground water that had been extracted as part of mining operations and diverted into a nearby stream where the petitioner sought an exclusive right to use it. *Id.* at 75. Prior appropriators on the stream objected, arguing that the water was subject to the same priority system for water native to the stream. *Id.* at 76. We disagreed, concluding that "such water[] . . . formed no part of [the stream's] natural flow[] and never would have come into the stream" in the first place "had it not been for the efforts of

from an unconnected stream system."); *id.* at 66 n.59 (referring to "water extracted from an underground source unrelated to the natural flow of the stream" as "developed water"); *City & Cty. of Denver v. Fulton Irrigating Ditch Co.*, 506 P.2d 144, 147 (Colo. 1972) ("[W]e see no distinction between the rights of owners of developed water from a mine and the rights of Denver as to its imported water.").

7

petitioner." *Id.* at 75.  Therefore, we held that the petitioner had an exclusive right to use and collect the extracted water—one that existed separate and apart from the priority system in the stream.  *Id.* at 76–77.

¶7     We applied this precept in *Comrie v. Sweet*, 225 P. 214 (Colo. 1924):

> [O]ne who artificially develops or produces water and adds or turns the same into a natural stream, which water would not in due course otherwise have reached the stream on the surface or in the underlying sands, may acquire a right thereto superior to the adjudicated rights of earlier appropriators of the natural waters of the stream . . . .

*Id.* at 214.  Twenty-seven years later, we reaffirmed the principle in *Brighton Ditch Co. v. City of Englewood*, 237 P.2d 116 (Colo. 1951), this time in the context of water imported by transbasin diversion.  There, the City of Englewood sought, among other things, to change its point of diversion in the South Platte River.  *Id.* at 118. Downstream appropriators objected based on the expected decrease in transmountain water return flows from which they benefited.  *Id.* at 118–19.  But our court rejected their argument, explaining that "appropriators on a stream have no vested right to a continuance of importation of foreign water which another has brought to the watershed."  *Id.* at 122.  Because the water in question was not native to the stream, we found that the City of Englewood had no obligation to maintain the return flows for downstream appropriators.  *Id.*  Thus, "*Brighton Ditch* suggests an implicit recognition that an importer has a greater right to use the water for its

8

own beneficial purposes than do appropriators of native water." *Bijou*, 926 P.2d at 66.

¶8    The imported water doctrine was subsequently codified by the General Assembly as part of the Water Right Determination and Administration Act of 1969. *Id.* at 66–67. Section 37-82-106(1), C.R.S. (2019), provides:

> Whenever an appropriator has lawfully introduced foreign water into a stream system from an unconnected stream system, such appropriator may make a succession of uses of such water by exchange or otherwise to the extent that its volume can be distinguished from the volume of the streams into which it is introduced. Nothing in this section shall be construed to impair or diminish any water right which has become vested.

¶9    Though the right to reuse imported water to exhaustion "existed independently of the statute," the passage of "[s]ection 106(1) expressly establishes that the rules applicable to foreign water differ from the rules that govern the use of native water." *Bijou*, 926 P.2d at 67. Whereas appropriators of water native to a stream generally may not reuse or make successive use of water after initial use, "a plain reading of the [imported water] statute suggests that legal importation of foreign water is the only prerequisite for future reuse and successive use of such water."[5] *Id.* at 68–69. This makes sense for two reasons. First, but for the

_____

[5] "Reuse" refers to a subsequent use of the imported water for the same purposes as the original use; "successive use" refers to a subsequent use of the imported water for a different purpose than the original use. *See Fulton*, 506 P.2d at 146–47.

importer's efforts, the water would not be in the basin of use to begin with. *See City of Florence v. Bd. of Waterworks of Pueblo*, 793 P.2d 148, 154 (Colo. 1990). Second, allowing importers of foreign water to reuse and make successive use of that water helps ensure they don't divert more water from the basin of origin than is necessary. *See Grand Valley Water Users Ass'n v. Busk-Ivanhoe, Inc.*, 2016 CO 75, ¶ 48, 386 P.3d 452, 465 ("Importers of foreign water are accorded wide latitude as to the use and disposal of the water in the basin of import in order to allow the flexible and efficient use of foreign water and to minimize the amount of water imported . . . ."); *Fulton*, 506 P.2d at 148 ("In order to minimize the amount of water removed from [the basin of origin] . . . importers should, to the maximum extent feasible, reuse and make successive uses of the foreign water.").

¶10     Changes to imported water rights aren't subject to the restrictions that changes to native water rights are. In the context of native water, section 37-92-305(3), C.R.S. (2019), requires an applicant to show that the proposed change won't cause injury to other water users. But when a change-of-use application is related to imported water, the "no-injury" requirement of section 37-92-305(3) doesn't apply because of the "common law rule that downstream users of return flows from foreign waters . . . do not have a vested right in future importation." *Bijou*, 926 P.2d at 71. Therefore, imported water is "exempt from the restrictions of section 37-92-305(3)." *Id.* at 73; *see also Bd. of Waterworks of Pueblo*, 793 P.2d at

10

154 ("Because these actions involve foreign water and are addressed by section 37-82-106 . . . the general change of water right criteria . . . are inapplicable.").

¶11     The only injury legally possible from a change to imported water rights is if the change increases the historical amount, rate, or length of time of diversion so as to adversely affect junior priorities *in the basin of origin*. Robert V. Trout et al., *Acquiring, Using, and Protecting Water in Colorado* 147 (rev. ed. 2011). Thus, a water court may impose terms and conditions to ensure that the amount of water diverted from the basin of origin doesn't change compared to historical practice. *Id.*

¶12     With this recap of the pertinent law as a backdrop, we now turn to review the history of the administration of water rights in the Subdistrict. This historical background, in addition to being the linchpin to understanding the impetus for SMRC's change application, contextualizes Warner's contentions.

## II.  Historical Background of the Subdistrict

¶13     As the water court observed, the Valley, which is located in south-central Colorado, spans approximately ninety miles from north to south and fifty miles from east to west. Findings of Fact, Conclusions of Law, Judgment and Decree, *Concerning the Application for Water Rights of the Santa Maria Reservoir Co.*, Case No. 13CW3002 (Dist. Ct. Water Div. 3 June 1, 2018) (2018 SMRC Decree), ¶ 46. It is sandwiched between the Sangre De Cristo Range (to the east) and the San Juan

11

Mountains (to the west). *Id.* at ¶ 99. The Rio Grande enters the Valley on the west side near Del Norte and continues in a southeasterly direction through Monte Vista to Alamosa, where it takes a southerly course for nearly forty miles and, passing through a break in the San Luis Hills, flows into New Mexico. *Id.* at ¶ 46. In *Simpson v. Cotton Creek Circles, LLC*, 181 P.3d 252 (Colo. 2008), we described the unique water systems of the Valley as follows:

> The Valley contains underground water in the form of a confined aquifer and an unconfined aquifer. The unconfined aquifer lies above the confined aquifer, and it is directly connected with surface streams in some places. Below the unconfined aquifer lie "relatively impermeable beds of clay and basalt," which separate the unconfined aquifer from the confined aquifer. The layers of clay and basalt do not exist around the perimeter of the Valley, and so surface water recharges the confined aquifer system at those edges.

*Id.* at 255 (citations omitted). The illustration below depicts a cross-section of generic confined and unconfined aquifers:[6]



---

[6] *See Aquifer*, Nat'l Geographic, https://www.nationalgeographic.org/media/aquifer-illo/ [https://perma.cc/6KSU-JT9P].

¶14    There are multiple geographic regions within the Valley.  One of those, the Closed Basin, is of particular relevance here.  Below is a map outlining the area of the Closed Basin within the Valley (the Valley is depicted by the purple outline):[7]



[7] *See* Jingyi Chen et al., Confined Aquifer Head Measurements and Storage Properties in the San Luis Valley, Colorado, from Spaceborne InSAR Observations, Water Res. Research (April 21, 2016) https://doi.org/10.1002/2015WR018466 [https://perma.cc/K5U2-X46C].

¶15 The Closed Basin is a watershed north of the Rio Grande that is separated from the Rio Grande and its tributaries by both a topographic divide and a hydraulic divide.[8] 2018 SMRC Decree, ¶ 50. As a result of the topographic divide, surface streams entering the Closed Basin do not flow into the Rio Grande. *Id.* at ¶ 51. Instead, they flow toward the "sump," which is the topographic low point of the Closed Basin. *Id.* The hydraulic divide has the same effect: Groundwater in the unconfined aquifer of the Closed Basin flows to the sump, not to the Rio Grande. *Id.* Groundwater pumping occurs primarily in two regions of the Valley, the Closed Basin and the Conejos and Alamosa River Valleys, and is critical to support the thriving agricultural economy in the high-altitude desert-climate of the area. Jingyi Chen et al., *Confined Aquifer Head Measurements and Storage Properties in the San Luis Valley, Colorado, from Spaceborne InSAR Observations*, Water Res. Research (April 21, 2016) https://doi.org/10.1002/2015WR018466 [https://perma.cc/K5U2-X46C].

¶16 Irrigation and recharge practices play an important role in the hydrology of the Closed Basin and, notably, affect the location and status of the hydraulic

---

[8] The "hydraulic divide" refers to a ridge in the groundwater table that lies north of the Rio Grande and extends generally from northwest of Monte Vista to east of Alamosa. It is approximately at the southern boundary of the Closed Basin. This ridge prevents the natural movement of unconfined groundwater from the Closed Basin into the Rio Grande. *See Alamosa-La Jara Water Users Prot. Ass'n v. Gould*, 674 P.2d 914, 943 (Colo. 1983).

14

divide. 2018 SMRC Decree, ¶¶ 70–79. As the water court explained, "large-scale importation of water into the Closed Basin . . . created the hydraulic divide," and the hydraulic divide's "location varies in response to climatic conditions and irrigation practices." *Id.* at ¶ 75. Historically, well-pumping within the Closed Basin has had the effect of diminishing the hydraulic divide, which in turn has led to injurious depletions to the Rio Grande. *See* Findings of Fact, Conclusions of Law and Order, *Concerning the Office of the State Engineer's Approval of the Plan of Water Mgmt. for Special Improvement Dist. No. 1 of the Rio Grande Water Conservation Dist., and In re Rio Grande Water Conservation Dist.*, Case Nos. 07CW52 and 06CV64 (Dist. Ct. Water Div. 3 Feb. 18, 2009) (2009 Subdistrict Decree), ¶ 59. In addition, well-pumping in the Closed Basin has depleted the surface streams and aquifers in the Closed Basin—a system that has long been understood to be overappropriated. *See, e.g., Alamosa-La Jara Water Users Prot. Ass'n v. Gould*, 674 P.2d 914, 918 (Colo. 1983) ("By 1900, the natural flow of all surface streams in the [V]alley was over-appropriated."). Though efforts have been undertaken for years to offset these depletions, ultimately, it was "[t]he significant drought of the early twenty-first century [that] increased the urgency for a sustainable water supply solution" in the Closed Basin. *San Antonio, Los Pinos & Conejos River Acequia Pres. Ass'n v. Special Improvement Dist. No. 1* (*San Antonio I*), 270 P.3d 927, 933 (Colo. 2011).

¶17 In 2004, the General Assembly took up this issue and adopted Senate Bill 04-222 ("SB 04-222"), which requires the State Engineer to focus on the sustainability of the Closed Basin's aquifer system by regulating the confined and unconfined aquifers so as to "maintain a sustainable water supply in each aquifer system." § 37-92-501(4)(a)(I), C.R.S. (2019). The passage of SB 04-222 also offered water users in the Valley "the opportunity to work together to protect senior water rights by collective actions" aimed at reducing "water use in general via the formation of subdistricts." Findings of Fact, Conclusions of Law, Judgment and Decree, *In re Confined Aquifer New Use Rules for Div. 3*, Case No. 04CW24 (Dist. Ct. Water Div. 3 Nov. 9, 2006) (2006 Confined Aquifer New Use Rules Decree), ¶ 417; *see* § 37-92-501(4)(b)(I), (c). A group of water users in the Rio Grande Water Conservation District ("RGWCD") followed suit and developed the framework for what would become the Subdistrict (the Subdistrict's formal name is "Special Improvement District No. 1 of the Rio Grande Water Conservation District"). 2009 Subdistrict Decree, ¶ 20. The designated goal of the Subdistrict was the management of groundwater in the Closed Basin. *Id.* at ¶¶ 20, 38.

¶18 Once the Subdistrict was approved by the Alamosa County District Court in July 2006, the RGWCD appointed a board of managers (the "Board") and charged it with preparing a plan of water management, pursuant to section 37-48-126, C.R.S. (2019). *Id.* at ¶ 21. The Board held several public meetings to

16

gather input from the major ditch companies and other irrigators operating in the Closed Basin regarding declining water levels in the aquifers and depletions to the Rio Grande. *Id.* Based on this feedback and consultations with expert water engineers, the Board decided that it needed more information on the current location and status of the hydraulic divide to formulate a groundwater management plan that accurately accounted for the Closed Basin's current hydrological conditions. *See id.* The Board thus sought and received approval for state funding to conduct a study. *See id.*

¶19 The completed study, titled "Engineering Report on San Luis Valley Groundwater Level Study" ("Hydraulic Divide Study"), revealed that as of the fall of 2007, "groundwater contours from Del Norte to near Monte Vista d[id] not indicate the existence of a groundwater divide northerly of the Rio Grande," which led to the conclusion that well-pumping in the unconfined aquifer of the Closed Basin was causing depletions to the Rio Grande. *Id.* at ¶ 67. "The Hydraulic Divide Study also concluded, however, that a reduction in such well pumping in the Closed Basin and recovery of the aquifer" to sustainable levels "would likely result in restoring the [h]ydraulic [d]ivide," which in turn would yield a significant reduction in depletions to the Rio Grande. *Id.* at ¶ 68.

¶20 Given the findings of the Hydraulic Divide Study, the Subdistrict, through the Board, prepared a plan for water management (the "Plan") that included a

groundwater management strategy "based upon the premise that when or if the [h]ydraulic [d]ivide is north of the river between Del Norte and Alamosa, it reduces the injurious depletions to senior surface rights because it reduces leakage from the Rio Grande into the Closed Basin." *Id.* at ¶ 71. Thus, the Plan proposed to re-establish and maintain the hydraulic divide to help reduce or eliminate the depletions to the Rio Grande caused by irrigation-related well-pumping in the Closed Basin. *Id.* at ¶ 63.

¶21 To re-establish the hydraulic divide, the Subdistrict agreed to (1) "work closely with the State and Division Engineers . . . to calculate injurious stream depletions resulting from well pumping," and (2) "replace those depletions in the time, at the location, and in the amount needed to prevent injury." *Id.* at ¶ 95. Once re-established, the Plan explained, the hydraulic divide would be maintained through "a system of self-regulation using economic-based incentives that promote responsible irrigation water use and management and insure the protection of senior surface water rights." *Id.* at ¶ 41. Such incentives would include giving owners of surface water rights within the Subdistrict "surface water credits which [would] reduce the variable fee they are . . . assessed for water they pump," and could be "exchanged, traded, leased or sold to other well water users within the Subdistrict." Findings of Fact, Conclusions of Law, Judgment and Decree, *In re Rio Grande Water Conservation Dist., and Concerning the Office of the*

18

*State Engineer's Approval of the Plan of Water Mgmt. for Special Improvement Dist. No. 1 of the Rio Grande Water Conservation Dist.*, Case Nos. 06CV64 and 07CW52 (Dist. Ct. Water Div. 3 May 27, 2010) (2010 Subdistrict Decree), ¶¶ 77–78.  In other words, the Plan sought to replace the injurious stream depletions caused by operation of the Subdistrict wells with water rights that would be purchased or leased by the Subdistrict.  *Id.* at ¶ 267.

¶22    Following many rounds of revisions, the Subdistrict's amended Plan (the "Amended Plan") was approved by the water court in May 2010.  It was subsequently upheld by this court in December 2011 in *San Antonio I*, 270 P.3d at 935.

¶23    The implementation of the Amended Plan meant that the Subdistrict had to begin replacing injurious stream depletions in 2012.  Recognizing that it would need both stored water and storage space to meet its replacement obligations, the Subdistrict approached SMRC, which owns two reservoirs, about leasing water from the Company's shareholders to replace depletions under the Amended Plan. SMRC took the Subdistrict up on its proposal.  But because its water rights were limited to irrigation, SMRC had to apply for a change of use to include the replacement of depletions.  That application became the genesis of the dispute that is at the heart of this case.

19

## III. Facts and Procedural History

¶24 SMRC is a mutual reservoir company that is responsible for storing and releasing water to its shareholders, who own the right to use that water. All SMRC shareholders have their water delivered either through the Monte Vista Canal or the Rio Grande Canal. The Company's bylaws allocate ten percent of its shares to the shareholders whose lands are served by the Monte Vista Canal and ninety percent of its shares to the shareholders whose lands are served by the Rio Grande Canal. Only the Rio Grande Canal delivers water into the Closed Basin for irrigation use.[9]

¶25 SMRC's water is stored in its two reservoirs: the Santa Maria Reservoir and the Continental Reservoir.[10] The Company's water storage rights in both reservoirs predate the Rio Grande Compact (the "Compact"), which sets storage

---

[9] The vast majority of lands served by the Rio Grande Canal are located within the Closed Basin; the remaining lands served by the Rio Grande Canal lie south of the Closed Basin between the hydraulic divide and the Rio Grande. 2018 SMRC Decree, ¶ 90.

[10] SMRC holds absolute storage rights in the Santa Maria Reservoir and the Continental Reservoir. Under a series of decrees, SMRC is currently entitled to store a total of 37,524 acre-feet in the Santa Maria reservoir (15,871.21 acre-feet with an appropriation date of August 11, 1896, and 21,652.79 acre-feet with an appropriation date of September 22, 1902). It can also store a total of 26,716 acre-feet in the Continental Reservoir (8,832 acre-feet with an appropriation date of June 1, 1901, and 17,884 acre-feet with an appropriation date of May 4, 1907). SMRC's application sought a change of use for all of this water, which was decreed for irrigation.

restrictions on reservoirs constructed after its enactment. Because most water users in the Valley have water storage rights postdating the Compact, they cannot store as much water as SMRC can. Not surprisingly, SMRC was an appealing potential partner for the Subdistrict as the Subdistrict undertook efforts to comply with the provisions of the Amended Plan.

¶26 When the Subdistrict contacted SMRC, shortly after this court upheld the Amended Plan in *San Antonio I*, it inquired about leasing water from SMRC's shareholders to replace depletions to the Rio Grande. Because all of SMRC's shareholders rely on the Subdistrict's continued success, SMRC had every incentive to help the Subdistrict meet its replacement obligations. As mentioned, though, SMRC could not do so unless it first obtained a change-of-use decree allowing its water to be used for replacement, in addition to its already-decreed use for irrigation.[11]

¶27 In January 2013, SMRC filed an "Application for Change of Water Right" to use its water storage rights in the Santa Maria and Continental Reservoirs to replace depletions to the Rio Grande in order to prevent injury to surface water

---

[11] To apply for a change-of-use decree, SMRC needed to amend its articles of incorporation and bylaws to give shareholders the power to lease their water–right shares to the Subdistrict. After notifying shareholders by letter and holding open meetings, the necessary amendments were approved, thereby allowing shareholders to lease their pro rata shares of reservoir water to the Subdistrict for use in Water Division No. 3.

rights in the Rio Grande and elsewhere in Water Division No. 3. In addition to its requested change of use, SMRC asked the water court to confirm the Company's: (1) historical irrigation use of water rights on lands served by the Monte Vista Canal and Rio Grande Canal; (2) historical irrigation practice of using water rights for aquifer recharge and withdrawal of corresponding water by means of wells; and (3) right to fully consume, by first use, reuse, and successive use, the water it delivers into the Closed Basin.

¶28 The water court accurately explained the practical effect of the change requested by SMRC as follows: "[T]he leased water will be released from the reservoirs and sent down the Rio Grande and will not be diverted for irrigation in the service area of the Rio Grande Canal, *i.e.* in the Closed Basin." 2018 SMRC Decree, ¶ 81. Anticipating a reduction in the amount of water diverted to the Closed Basin, Warner and a number of other parties filed timely statements of opposition to SMRC's application, arguing that, if granted without adequate terms and conditions, the requested change would injure water users in the Closed Basin. The water court referred the application and statements of opposition to the Water Referee for Water Division No. 3, who, pursuant to section 37-92-302(4), C.R.S. (2019), was charged with evaluating the merits of the opposers' statements in consultation with the Division Engineer.

¶29    In May 2013, after reviewing the application and statements of opposition, the Division Engineer submitted a written report in which he recommended "that th[e] requested change of water right be granted" with one condition: "that such change . . . not expand the consumption of the water right beyond that which has been the historical practice for agricultural purposes." SMRC then met with the various opposers to explore what terms and conditions might assuage their concerns. Based on their input, it drafted a proposed decree in which it agreed to replicate accretions (including return flows) to the Rio Grande to prevent injury to other water rights diverting from the Rio Grande. By April 2016, all opposers except Warner had stipulated to the entry of SMRC's proposed decree, and so SMRC moved to refer the case back to the water court to hold a trial on SMRC's application in light of Warner's objections.

¶30    Warner's statement of opposition was premised on his concern that SMRC's application, if granted, would interfere with his downstream surface and groundwater rights. Warner, a rancher, owns two parcels of land on which he grows hay for his livestock using flood irrigation. His properties are located in the Closed Basin, generally east and north of land that receives the water SMRC delivers through the Rio Grande Canal. Because he flood irrigates, Warner needs the groundwater beneath his lands to stay at a level close enough to the surface to reduce ditch losses and allow water to carry further across his crop land. Thus, to

the extent that the water court's approval of SMRC's application might result in lower surface and groundwater levels in the Closed Basin, Warner's ability to continue flood irrigating his crops is at risk. Accordingly, Warner opposed SMRC's requests for change of use and for recognition of both its historical recharge practice and its right to fully consume its water.

¶31 At trial, SMRC presented evidence to show that its proposed change of use would not cause harm to other water users. The Company's expert witness, Thomas Williamsen, who specializes in water resources engineering, testified that he had quantified SMRC's historical use of water between 1940 and 2010. According to Williamsen, the data showed that owners of SMRC's water rights have historically diverted all water legally and physically available to them, such that SMRC's water has not been appropriated by downstream users in the Rio Grande. Williamsen's findings were corroborated by SMRC's two lay witnesses, SMRC's president, Keith Holland, and SMRC's superintendent, Jay Yeager. Further, SMRC asserted that the water it diverts into the Closed Basin is imported from the Rio Grande, which means that other water users have no vested right in that water.

¶32 SMRC did concede, however, that not all of its water is imported because a small portion of it is diverted to the area just south of the Closed Basin and the hydraulic divide, where it may accrete to the Rio Grande. But SMRC assured the

24

water court that there was no risk of injury to water users there because the Company had already agreed, as part of its settlement with the other opposers, to replicate accretions to the Rio Grande that may result from the approved change of use. For his part, Warner offered no hydrological or geological evidence to demonstrate that the Company's proposed change would adversely affect his surface and groundwater rights. *See* 2018 SMRC Decree, ¶ 181.

¶33 With regard to the request for recognition of its historical recharge practice, SMRC asked the court to take judicial notice of prior water court decrees from Water Division No. 3 documenting SMRC's recharge practice in the Closed Basin.[12] Each of SMRC's witnesses also testified to its historical recharge practice. Though Warner argued that the evidence presented didn't show that SMRC's water rights were historically used for recharge, he did not present any evidence

---

[12] The prior water decrees referenced by SMRC were entered in the following cases: Findings of Fact, Conclusions of Law, Judgment and Decree, *Concerning the Application for Change of Water Right of Rio Grande Canal Water Users Ass'n*, Case No. W-3979 (Dist. Ct. Water Div. 3 Dec. 27, 1984) (1984 Rio Grande Canal Decree); Findings of Fact, Conclusions of Law, Judgment and Decree, *Concerning the Application for Change of Water Right of San Luis Valley Irrigation Dist.*, Case No. W-3980 (Dist. Ct. Water Div. 3 Dec. 27, 1984) (1984 San Luis Valley Irrigation District Decree); Findings of Fact, Conclusions of Law, Judgment and Decree, *In re Prairie Ditch Co.*, Case No. 96CW45 (Dist. Ct. Water Div. 3 Nov. 30, 2001) (2001 Prairie Ditch Company Decree); Findings of Fact, Conclusions of Law, Judgment and Decree, *In re San Luis Valley Canal Co.*, Case No. 96CW46 (Dist. Ct. Water Div. 3 Nov. 4, 2002) (2002 San Luis Valley Canal Company Decree); 2006 Confined Aquifer New Use Rules Decree; and 2010 Subdistrict Decree.

showing why the water court should conclude that the historical facts reflected in the previous decrees were inaccurate or no longer true. Nor did he present any evidence to rebut the testimony of SMRC's witnesses, which the water court found credible and persuasive.

¶34 Finally, as to the request for recognition of its right to fully consume its water to extinction, SMRC maintained that since the water it diverts into the Closed Basin would not have flowed there absent its efforts, and once there, does not naturally flow back to the Rio Grande, it is imported water that its shareholders are entitled to fully consume. *See* § 37-82-106(1). Warner disputed SMRC's imported-water claim. He noted that recent decrees from Water Division No. 3 had mentioned that the hydraulic divide historically separating the Closed Basin from the Rio Grande no longer appeared to be clearly established. Thus, asserted Warner, the Closed Basin was not "unconnected" from the Rio Grande and should be considered tributary to the Rio Grande.

¶35 As further support for his contention that the Closed Basin and the Rio Grande are hydraulically connected, Warner pointed to the data Williamsen presented, which showed that removing SMRC's water from irrigation in the Rio Grande Canal service area could reduce accretions to the Rio Grande. But Williamsen also testified that his review of groundwater flow data and consultations with other experts in the field indicated that the projected losses are

26

entirely attributable to the area just south of the Closed Basin, between the hydraulic divide and the Rio Grande. And, while acknowledging that recent decrees had mentioned that the divide appeared to have diminished, Williamsen opined that more current maps of groundwater contours showed that water in the Closed Basin was still moving away from the divide toward the sump instead of returning to the Rio Grande. Notably, Warner presented zero evidence to rebut this testimony.

¶36 After three days of trial, the water court issued a thorough and well-reasoned order. First, it approved the application for change of use subject to SMRC's compliance with various terms and conditions, including that SMRC replicate historical accretions to the Rio Grande. "The terms and conditions of this decree, if properly implemented," the water court explained, "will replicate . . . historical accretions and prevent injury to other water rights diverting from the Rio Grande." 2018 SMRC Decree, ¶ 170. Second, the water court recognized the historical irrigation use of SMRC's water rights on lands served by the Monte Vista and Rio Grande Canals, *id.* at ¶ 43, and the historical irrigation practice of recharging the unconfined aquifer of the Closed Basin with SMRC's

27

water rights, *id.* at ¶ 62.[13] Finally, the water court determined that SMRC was entitled to fully consume—by first use, reuse, and successive use—water recharging the aquifers of the Closed Basin to provide a water supply for irrigating lands within the Subdistrict. *Id.* at ¶ 119.

¶37 As it relates to SMRC's right to consume its water to extinction, the water court concluded that the water is imported. *Id.* at ¶ 116. The evidence, observed the court, showed that this water "does not naturally flow into the Closed Basin, and once it is there, . . . does not naturally return to the Rio Grande." *Id.* at ¶ 69. The court acknowledged that recent decrees had cited studies "indicat[ing] that the [hydraulic] divide" between the Rio Grande and the Closed Basin "has retreated to very near the Rio Grande and . . . is not well-defined." *Id.* at ¶ 78. But the court reasoned that those studies didn't establish "that the divide does not exist." *Id.* And, added the court, both Williamsen and the Assistant Division Engineer, James Heath, provided "credible, uncontroverted testimony that the hydraulic divide exists and . . . surface streams and groundwater in the unconfined aquifer of the Closed Basin do not flow to the Rio Grande," while Warner failed to put forth any evidence to the contrary. *Id.* at ¶ 79.

---

[13] The water court took judicial notice of its prior orders describing how other water rights diverted through the Rio Grande Canal have been historically used to recharge the aquifers of the Closed Basin. *Id.* at ¶ 44; *see supra* n. 12.

28

¶38     After the water court entered its decree, Warner filed a Motion to Amend Judgment, arguing that (1) the water SMRC delivers to the Closed Basin is not imported; (2) the court needed to reduce SMRC's water-pumping to prevent injury; and (3) the court should have conducted a historic consumptive use analysis as required by Colorado law.  Warner did not cite any legal authority in support of his claims, and the court denied the motion.  The court explained that the first argument was unsupported by facts or law, the second argument was not properly before the court, and the third argument was incorrect because the court had actually conducted the historic consumptive use analysis.  At SMRC's request, the court then found that Warner's motion was "substantially groundless and frivolous" and awarded SMRC its attorney fees.  Warner then appealed to this court.

## IV.  Standard of Review

¶39     Whether certain water is foreign to a stream system or watershed under Colorado law is a mixed question of law and fact.  *See Chatfield E. Well Co. v. Chatfield E. Prop. Owners Ass'n*, 956 P.2d 1260, 1271–72 (Colo. 1998).   Mixed questions of law and fact are reviewed de novo, *see Pagosa Area Water & Sanitation Dist. v. Trout Unlimited*, 170 P.3d 307, 313 (Colo. 2007), but with deference to the water court's factual findings if they are supported by the evidence, *City of Black Hawk v. City of Central*, 97 P.3d 951, 953 (Colo. 2004).  The sufficiency, probative

29

effect, and weight of the evidence before the water court, together with inferences and conclusions to be drawn therefrom, are for the water court's determination. *Gibbs v. Wolf Land Co.*, 856 P.2d 798, 801 (Colo. 1993). We will not disturb such a determination unless it is "so clearly erroneous as to find no support in the record." *Id.*

## V. Analysis

¶40 An application for change of a water right "shall be approved" if the proposed change "will not injuriously affect . . . persons entitled to use water under a vested water right or a decreed conditional water right." § 37-92-305(3)(a). An applicant for change of a water right "bears the initial burden of establishing a prima facie case that the proposed change will not have an injurious effect" on the water rights of others. *City & Cty. of Broomfield v. Farmers Reservoir & Irrigation Co.*, 235 P.3d 296, 299 (Colo. 2010). If the applicant successfully meets this initial burden, then "the opposers have the burden of going forward with evidence that the proposed change will result in injury to existing water rights." *Id.*

¶41 Here, the water court found that SMRC met its burden—both by showing that the proposed change pertains to imported water, 2018 SMRC Decree, ¶ 79, and by agreeing to replicate accretions (including return flows) to the Rio Grande to prevent injury to other water rights diverting from the Rio Grande, *id.* at ¶ 170. Because Warner failed to present evidence to rebut SMRC's prima facie case, the

water court approved SMRC's requested change of use. *Id.* at ¶ 181. We perceive no basis to disturb the water court's decision.

¶42 Warner first contends that the water court applied the wrong legal standard in finding that the water SMRC diverts to the Closed Basin is imported. More specifically, Warner avers that designating water as imported based on whether it would have naturally reached the stream system or watershed where it is being used and, once there, whether it would have naturally flowed back to its source contravenes Colorado law. We disagree.

¶43 We have repeatedly said that when water is introduced into a stream system from an unconnected stream system, it is imported. *See Bijou*, 926 P.2d at 66. Though we have never expressly defined "unconnected" stream systems, we have consistently applied the same test to ascertain whether two streams are connected: If the water would not have reached the receiving stream system without the efforts of the water user and, once there, would not naturally have flowed back to its original stream system, then the two systems are "unconnected" and the water is imported. *See, e.g.*, *id.* at 81 ("[E]ntities that produce or develop artificial water that would otherwise have been unavailable to the stream system . . . can exert a continuing right to such water outside the existing priority system on the stream."); *id.* (rejecting the City of Thornton's claim that water diverted from the Cache La Poudre River and delivered to adjacent drainages between the Poudre

31

and South Platte Rivers was imported because the water so delivered naturally drained back to the South Platte River, to which the Poudre River is a tributary); *Fulton*, 506 P.2d at 147 ("'[D]eveloped water' is that water which has been added to the supply of a natural stream and which never would have come into the stream had it not been for the efforts of the party producing it."); *Comrie*, 225 P. at 214 ("[O]ne who artificially develops or produces water and adds or turns the same into a natural stream, which water would not in due course otherwise have reached the stream . . . may acquire a right thereto superior to the adjudicated rights of earlier appropriators of the natural waters of the stream . . . ."); *Ripley*, 90 P. at 75 (holding that water was developed because it "formed no part of [the stream's] natural flow, and never would have come into the stream in any way had it not been for the efforts of petitioner").

¶44    Thus, the water court did not err. In our view, it properly determined that since SMRC's water "does not naturally flow into the Closed Basin, and once . . . there, . . . does not naturally return to the Rio Grande," 2018 SMRC Decree, ¶ 69, it is imported. As such, the water court properly concluded that Warner has no right to maintenance of return flows from the historical use of this water.[14]

---

[14] Warner posits that the water court mistakenly held that SMRC was not required to introduce evidence quantifying the return flows from its water. Quantification

32

¶45 Warner's remaining arguments are largely challenges to the water court's findings of fact. We decline his invitation to second-guess the water court because its factual findings are not "clearly erroneous." *Burlington Ditch*, 256 P.3d at 667 ("Recognizing the water court's unique ability to evaluate evidence and make factual determinations in complex cases, we defer to the findings of the water court unless they are clearly erroneous."). Applying this highly deferential standard, we discuss and reject each of Warner's specific contentions in turn.

¶46 Warner argues that the water court was wrong in finding that the Rio Grande and Closed Basin are "unconnected" stream systems. He insists that the water court failed to consider the hydraulic connections between SMRC's return flows, the Rio Grande's surface flows, and the confined and unconfined aquifers in the Closed Basin. But the water court did consider—at length no less—"the complex and non-linear interactions between the unconfined and confined aquifer systems and the surface streams." 2018 SMRC Decree, ¶ 87; *see also id.* at ¶ 66 (noting that "the evidence showed that the SMRC Water Rights are naturally tributary to the Rio Grande" and that "[w]ater from the Rio Grande . . . does not naturally reach the Closed Basin"); *id.* at ¶ 72 (quoting the Compact's definition of

of SMRC's return flows, avers Warner, was necessary to protect his interests. Because this argument is premised on Warner's incorrect assumption that he has a right to SMRC's return flows, it fails.

33

the Closed Basin as "that part of the Rio Grande Basin in Colorado where the streams . . . do not normally contribute to the flow of the Rio Grande"); *id.* at ¶ 79 (reviewing the "credible, uncontroverted testimony that the hydraulic divide exists and that because of the topographic and hydraulic divides, the surface streams and groundwater in the unconfined aquifer of the Closed Basin do not flow to the Rio Grande"); *id.* (mentioning that Warner "did not provide . . . any evidence from which the court could make a different factual finding").

¶47 Nevertheless, Warner maintains that the water court's determination is at odds with this court's 2011 observation in *San Antonio I* that, in contrast to "previous court decrees and groundwater studies" indicating that a "divide formerly existed" between "the unconfined aquifer of the Closed Basin and the unconfined aquifer . . . tributary to the Rio Grande," no divide "clearly exists today." 270 P.3d at 941. Warner urges that the stream systems in question cannot be deemed unconnected after *San Antonio I.* We are not persuaded.

¶48 After considering *San Antonio I,* the water court recognized that recent studies have indicated "that the divide has retreated to very near the Rio Grande and that the divide is not well-defined." 2018 SMRC Decree, ¶ 78. But it was quick to point out that none of the evidence presented during the trial supported the conclusion that the divide no longer exists. *Id.* As the water court put it: Even assuming "the hydraulic divide is poorly defined or very close to the Rio Grande,"

34

the evidence established that "water flowing north into the Closed Basin does not return to the Rio Grande." *Id.* at ¶ 77.

¶49 On the surface, the water court's finding may seem inconsistent with the remark in *San Antonio I* on which Warner places so much stock. But upon closer inspection, the two are perfectly aligned. Recall that when we made the statement in *San Antonio I*, it was in the context of reviewing and approving the Subdistrict's Amended Plan. The very purpose of the Amended Plan was "to *re-establish and maintain* the [h]ydraulic [d]ivide." 2009 Subdistrict Decree, ¶ 63 (emphasis added). We explained in *San Antonio I* that the Amended Plan sought "to monitor and *maintain a mound of groundwater as a hydraulic divide* between the unconfined aquifer of the Closed Basin and the unconfined aquifer . . . tributary to the Rio Grande." *San Antonio I*, 270 P.3d at 941 (emphasis added). We added that the lack of such a divide was "perhaps one reason why Subdistrict well pumping" was "causing depletions to the Rio Grande and its tributaries." *Id.*

¶50 Fast forward to this case, which proceeded to trial almost a decade later, many years after the Amended Plan was implemented. The water court concluded, with abundant record support, that the "credible, uncontroverted testimony showed that the hydraulic divide exists" again. *See* 2018 SMRC Decree, ¶ 79. Rather than view this conclusion as incongruous with *San Antonio I*, we see

35

it as a testament to the Amended Plan's success so far. The Amended Plan appears to be doing precisely what it was designed to do.[15]

¶51 Just as we acknowledged a change related to the hydraulic divide in *San Antonio I*, the water court did the same here. The only difference is that the hydraulic divide did not clearly exist when we decided *San Antonio I*, whereas the water court in this case found that it currently exists. If Warner's rigid approach had merit, we never would have been able to say in *San Antonio I* that a change had occurred. Instead, regardless of what the evidence reflected at the time, we would have stubbornly hewed to whatever observations appeared in previous studies, decrees, or cases regarding the existence of the hydraulic divide. Because these matters can be fluid and are subject to change, we reject Warner's analytical framework. Where, as here, the evidence (including the experts' testimony) is credible, persuasive, and uncontroverted, we prefer to rely on the record as the most accurate, current, and complete indication of whether the hydraulic divide

---

[15] Indeed, the most recent edition of the Citizen's Guide to Colorado Groundwater noted that "[s]tarting in 2012, farmers [in the Closed Basin] began operation of the first groundwater subdistrict in the [V]alley with a state-approved groundwater management plan." *Citizen's Guide to Colorado Groundwater*, Water Education Colorado (March 19, 2020), https://issuu.com/cfwe/docs/groundwater_final [https://perma.cc/6UES-6VY2]. And while acknowledging that "[t]he program is still gaining steam," the Guide commented that "the efforts have slowed the [groundwater] declines and even replenished the aquifer in wet years." *Id.*

exists. And the record before us leaves no doubt: At this time, there is a hydraulic divide between the Closed Basin and the Rio Grande.

¶52 Warner contends, however, that the water court ignored its own recent decision in *In re Application for Water Rights of the City of Alamosa*, where it held that "water derived from the confined aquifer and placed into the Rio Grande" doesn't "meet the definition of imported water." Order Denying Motion for Determination of Question of Law, *In re Application for Water Rights of the City of Alamosa*, Case No. 15CW3029 (Dist. Ct. Water Div. 3 Oct. 31, 2018) (2018 City of Alamosa Decree), at 8. We are unpersuaded. The 2018 City of Alamosa Decree dealt with entirely different water rights. The water at issue there was *derived from the confined aquifer*. Here, the water under review is *derived from the Rio Grande* and diverted to the Closed Basin. In any event, the water court's ruling in this case was properly grounded in the evidence presented at trial. Had the court disregarded that evidence based on factual findings contained in the record from a previous case, it would have erred. Regardless, we are not bound by the water court's decision in its 2018 City of Alamosa Decree.

¶53 Finally, we are unmoved by Warner's assertion that the water court's approval of SMRC's application undermines the General Assembly's efforts to manage the surface and groundwater systems in the Valley. The development of the Subdistrict and the origins of this case demonstrate that the opposite is true.

37

¶54 The evidence presented at trial established that SMRC's purpose in filing its change-of-use application was to provide a source of water to the Subdistrict to help ensure the successful effectuation of the Amended Plan, which is critical to promoting long-term aquifer–sustainability. SMRC's proposed change was also triggered by a desire to support the Subdistrict's efforts to maintain the hydraulic divide and protect senior water rights in the Closed Basin. As the water court recognized:

> If less SMRC water is diverted for irrigation of land overlying the Closed Basin, there will be less water in the artificial aquifer of the Closed Basin which will result in the hydraulic divide moving closer to the Rio Grande which will result in less return groundwater flow to the river because there will be less irrigated acreage located south of the hydraulic divide and north of the river.

2018 SMRC Decree, ¶ 90. Warner "provided no expert [testimony] or other evidence" contradicting this conclusion. *Id.* at ¶ 91. Given the lack of contrary evidence, and given further the deference we accord to the water court's findings of fact, we find no basis to disturb the determination that approval of SMRC's proposed change promotes, rather than inhibits, the General Assembly's efforts to manage the surface and groundwater systems in the Valley.

## VI. Conclusion

¶55 The water court did not err either in approving SMRC's change-of-use application or in confirming SMRC shareholders' right to fully consume the water SMRC imports to the Closed Basin from the Rio Grande. Rather than cause an

injury to Warner, the water court's order simply revealed to him that his past use

of return flows from SMRC's imported water in the Closed Basin was a benefit to

which he had no enforceable right; Warner just didn't know what he had 'til it was

gone. We therefore affirm.[16]

---

[16] Warner challenges the water court's award of attorney fees against him, which it entered pursuant to C.R.C.P. 11 based on his motion for reconsideration of the final order. We review a decision to award attorney fees for an abuse of discretion. *Anderson v. Pursell*, 244 P.3d 1188, 1193 (Colo. 2010). A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair. *Campbell v. People*, 2019 CO 66, ¶ 21, 443 P.3d 72, 76. Here, the water court found, with ample record support, that Warner's motion to reconsider was "substantially groundless and frivolous," explaining that the motion's first argument was unsupported by facts or law, the second argument was not properly before it, and the third argument was factually incorrect. Because we cannot say that the court abused its discretion, we affirm the award of attorney fees.